**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RHONSHAWN JACKSON,** | : | **CIVIL ACTION NO. 3:22-0138** |
| **Plaintiff** | : | |
| | : | **(JUDGE MANNION)** |
| **v.** | : | |
| **UNIT MANAGER KNAPP,** *et al.***,** | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff Rhonshawn Jackson, who is incarcerated in the State Correctional Institution in Centre County, Pennsylvania (SCI-Rockview) and assigned to the Behavioral Management Unit (BMU) during times relevant to this lawsuit, filed this *pro se* Section 1983 and 1985 action on January 26, 2022. He asserts First, Eighth and Fourteenth Amendment claims, as well as a civil conspiracy claim under §1985, against four prison officials, alleging that Defendants conspired to orchestrate a years-long campaign of abuse, theft, and neglect against him in retaliation for the myriad of grievances he filed challenging the conditions of his confinement. Presently pending before this Court is Defendants' motion to dismiss which was converted to a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc.

16).[1] Because Jackson fails to carry his summary judgment burden on his constitutional tort and civil conspiracy claims, the Court will **GRANT** Defendants' motion for summary judgment.

## I.   <u>BACKGROUND</u>[2]

In March of 2020, Jackson was transferred to SCI-Rockview and assigned to the Behavioral Management Unit (BMU). (Doc. 12, ¶15).[3] Each inmate in the BMU is assigned a level status, between 1 and 5, whereby an inmate is granted certain privileges at each level; with the most privileges given to level 1 inmates, and the least to level 5 inmates. (*Id.*, ¶16). Upon entering the BMU, Jackson was initially placed on level 5 status but through

---

[1] In accordance with Federal Rule of Civil Procedure 12(d), Defendants' filed motion to dismiss (Doc. 16) was converted to a motion for summary judgment by way of the Court's order, (Doc. 23), because Defendants submitted, which this Court did not exclude, matters outside the pleadings.

[2] Local Rule of Court 56.1 requires that a motion for summary judgment be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." Local Rule of Court 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. *Id.* Defendants filed their statement of material facts, (Doc. 24), Jackson responded with his "Statement of Disputed Material Facts." (Doc. 28).

[3] Plaintiff's Second Amended Complaint (Doc. 12) is treated as the operative complaint. (*See* Doc. 23, p. 2).

hard work and continuous good behavior, was able to advance to level 2. (*Id.*, ¶17). At such level, Jackson was able to "participate in a step-down program for his advancement through the program like other inmates in the BMU are afforded … [and] also allowed to utilize the mini law library, the unit kiosk, as well as participate in other privileges that all Level 2 inmates in the BMU are afforded, along with being able to order sneakers & food packages." (*Id.*, ¶18).

Whilst in the BMU at SCI-Rockview, Jackson alleges that he immediately noticed several issues, including "the computers in the mini-law library were broken & not updated with recent cases," and the absence of "DOC policies in the mini-law libraries or grievance forms," accessible "mailboxes or grievance boxes," "clean sanitary cleaning supplies for inmates to clean their cells with,"[4] "clean sanitary bedding sheets, pillowcases & blankets for inmates to sleep on," an "exterminator that was coming around regularly to get rid of the insects & varmin [sic] that was flying around in the cells & biting [inmates]," and "new clean unsoiled Blue DOC uniforms for [inmates] to wear in the BMU[.]" (Doc. 12, ¶19). Such issues led

---

[4] It is unclear as to whether cleaning supplies were available but unclean and unsanitary, or that there were no cleaning supplies to begin with.

Jackson to file "a stream of grievances against [Defendant] Unit Manager Knapp in a[] good faith attempt to resolve these issues & concerns." (*Id.*). However, on August 2, 2020, just days after Jackson spoke with Defendant Knapp about his concerns, Jackson allegedly "discovered that two pairs of brand new sneakers that [he] had just purchased were missing [from his property]." (*Id.*, ¶20). According to Jackson, Defendant Knapp told him that his "officers needed some new shoes to wear when they went hiking & if [Jackson] didn't file so many damn grievances against staff, then maybe they would've chosen some other inmates' sneakers to go hiking in." (*Id.*, ¶21).[5] Steadfast in the face of this alleged threat, Jackson "continued to utilize the grievance procedure." (*Id.*, ¶22). A grievance procedure the Court is led to believe was open to Jackson.

Jackson filed a grievance against Defendant Knapp for the missing pairs of sneakers but never received his "pink copy to [his] grievance." (Doc. 12, ¶23).[6] Consequently, Jackson "sent follow-up requests to the Grievance

---

[5] Jackson's allegations create a paradox, where he asks this Court to believe that he was retaliated against for filing too many grievances when, at the same time, he was neither allowed nor given grievance forms to file with. (*See* Doc. 12, ¶¶19-22).

[6] In Defendants' Statement of Material Facts, Defendants provided Jackson's filed grievances, including the alleged retaliatory theft of his new shoes (No. 881212). (Doc. 24, Ex. B, pp.6-17).

Coordinator [Defendant Brubaker,] which went unanswered." (*Id.*). A year later, on or around September of 2021, Jackson "broke out in very painful sores & rashes all over [his] body." (*Id.*, ¶24). Jackson allegedly had "endured this pain for well over a month, which resulted in [him] having to be seen by the medical department & the doctor prescribed [him] pills for the pain that [he] took twice a day, & maximum strength, anti-itch, Hydrocortisone cream USP 1% for the itching & irritation[.]" (*Id.*). Jackson admits to being provided medical treatment and "new sheets, pillowcases, & a blanket." (*Id.*). Nevertheless, Jackson continued to file even more grievances against Defendant Knapp to better train prison staff on crisis intervention, receive more clean bedding and grievance forms in the mini-law library, and to challenge the denial of his step down from a Level 2 status. (*Id.*, ¶25). Defendants affirm that during the two-year period between Jackson's arrival at SCI-Rockview and the filing of this lawsuit, he has "filed a total of forty-four (44) grievances challenging the conditions of his confinement and the actions of prison staff." (Doc. 24, Ex. A, pp.4-5; *see also* Doc. 12, ¶¶19, 23, 25).

On or around October 18, 2021, after having filed grievances against Defendant Knapp, Jackson was allegedly told that he was placed on "grievance restriction" because of the grievances he filed against Defendant

Knapp and for raising concerns about the allegedly "inhumane living conditions in the BMU." (Doc. 12, ¶26). In response to this allegation, Defendants assert that Jackson was placed on grievance restriction for filing five frivolous grievances within a thirty-day period. (Doc. 24, ¶10). Jackson concedes that Defendants Solomon and Brubaker told him as much. (Doc. 12, ¶35).

Jackson appealed this restriction, asserting that it was retaliatory and denied him the opportunity to challenge the conditions of his confinement. (*Id.*, ¶28). Such an appeal was allegedly denied. (*Id.*) The restriction did not completely bar Jackson from filing grievances but limited him to filing one grievance every 15 working days. (Doc 24, Ex. B). Furthermore, the restriction did not prohibit Jackson from appealing previously filed grievances that had been rejected, denied, or deemed frivolous to the facility manager or the Secretary's Office of Inmate Grievances (SOIGA). (*Id.*).[7] If Jackson was dissatisfied with a decision of the facility manager, he may appeal to final review of SOIGA within 15 days from the date of the facility manager's

---

[7] DOC Administrative Directive 804 (DC-ADM 804) controls SCI-Rockview's grievance procedure and provides inmates with specific requirements for filing grievances and appeals to grievance responses. (Doc. 24, Ex. D, ¶II-III).

decision. (*Id.*, Sec. 2B, ¶1). In contrast, Jackson contends that "[t]he grievance restriction did prohibit [him] from appealing previously filed grievances that had been rejected, denied, or deemed frivolous due to being time barred, & not being permitted to re-file the same grievance/appeal twice." (Doc. 28, ¶13).

On October 26, 2021, Jackson was transported to another prison facility for a temporary stay (ATA). (Doc. 12, ¶30). Upon his return to SCI-Rockview, Jackson allegedly discovered that his trial transcripts, a ninety-three-page lawsuit draft "against SCI-Retreat & SCI-Rockview's staff," and three affidavits were missing from his property. (*Id.*, ¶33). Jackson asserts that Defendant Anna confessed to have stolen these documents and gave them to Defendant Knapp. (*Id.*, ¶36). Jackson also claims that he was later placed in an extremely cold cell near the Restricting Housing Unit (RHU). (*Id.*, ¶¶37-38). He avers that in this cell he was constantly subjected to banging, kicking, and yelling from other RHU inmates, resulting in lack of sleep, illness, and mental distress. (*Id.*, ¶¶38-40). Finally, Jackson alleges that Defendant Knapp failed to enforce proper Covid-19 mitigation protocols, resulting in him contracting the disease and becoming ill. (*Id.*, ¶¶39-41). Nevertheless, Jackson also admits that when prison officials discovered his illness, he was "immediately transported to the prison infirmary to a much

warmer cell/sanitary environment so that [he] could be properly treated."
(Doc.12, ¶40).

Jackson claims to have submitted grievances regarding his alleged
mistreatment at RHU, however, Defendants affirm that SCI-Rockview has no
record that Jackson ever submitted any such grievances in his voluminous
grievance history. (Doc. 24, Ex. A). Jackson counters that he attempted to
file these grievances but was not allowed to and presents to the Court two
grievance forms he was allegedly barred from filing. (Doc. 29, Exs. A and B).
Surprisingly, in contrast to the numerous grievance forms Jackson has
submitted to the Court, (Doc. 29, Ex. B, pp.4, 8, 12, 19, 21), the forms he
presents now to Court do not bear the typical stamp mark showing the time
and date of submission. (Doc. 29, Exs. A and B).[8] Moreover, all other
grievances Jackson filed were present in his records, to wit:

    a) RHU inmates making unreasonable noise by banging and yelling
       on cell doors (No. 858616). (Doc. 24, Ex. B, pp.1-5)

---

[8] The timing of these submissions to this Court calls into question their
veracity. Jackson had not presented these unstamped grievance forms in his
original complaint or as exhibits in his later amendments thereto. Jackson
only produced these forms after Defendants provided a complete list of
Jackson's 44 filed grievances.

b) Retaliatory theft of his new shoes (No. 881212). (Doc. 24, Ex. B, pp.6- 17; *see also* Doc. 12, at ¶23).

c) Insect and pest infestation in his cell (Nos. 883168 and 929265). (Doc. 24, Ex. B, at pp.18-22; *see also* Doc. 12, ¶19).

d) Denial of a step-down from level 2 of the BMU Program (Nos. 883169 and 950290). (Doc. 24, Ex. B, pp.23-31; *see also* Doc. 12, ¶19).

e) Lack of staff training (No. 950300). (Doc. 24, Ex. B, pp.32-35; *see also* Doc. 12, ¶25).

f) Issues with mini-law library (Nos. 950295 and 950299). (Doc. 24, Ex. B, at pp.36-41; *see also* Doc. 12, ¶25).

g) Retaliatory behavior from prison staff (Nos. 973364 and 973537). (Doc. 24, Ex. B, pp.42-46; *see also* Doc. 12, ¶19).

Defendants affirm that the only grievances not filed, to which Jackson references in his lawsuit, are regarding (a) the cold temperature of his cell, (b) lack of Covid-19 mitigation procedures, and (c) the theft of his legal documents.[9] (Doc. 24, ¶9). Moreover, during Jackson's time at SCI-

---

[9] In regard to the alleged theft of his legal documents, Jackson avers "I then told defendant Anna that I was filing a grievance against him &
*(footnote continued on next page)*

Rockview, the only grievance he appealed for final review was grievance number 883169 regarding his denial of a level step-down from his Level 2 status in the BMU Program. (Doc. 24, ¶8).

On January 18, 2022, Jackson made a full recovery from COVID-19 and was "released to the BMU to continue [his] quarantine" in allegedly "the same cold cell[.]" (*Id.*, ¶42). Three days later, Jackson allegedly "caught a sore thro[at] again" and raised his concerns to Defendant Knapp, who "contacted maintenance & got the heat [turned] on in the back cell." (*Id.*, ¶43). Jackson avers that Defendant Knapp told him "I just got the heat on for you but I don't know how long it'll stay on, so if I were you I would start withdrawing those grievances you filed against me before the next cold front comes in." (*Id.*, ¶44). However, Jackson also admits that Defendant Knapp told him an "officer would bring [him] extra blankets." (*Id.*, ¶45) (Doc. 28, ¶26). Jackson and Defendants affirm that Jackson was returned to his cell after he recovered at the infirmary, maintenance was contacted to turn up the heat, and Jackson did receive two additional blankets. (Doc. 24, ¶¶22-24; Doc. 28, ¶¶21-26).

---

defendant Knapp…" but does not state that he ever actually filed such a grievance. (Doc. 12, ¶36). A review of Jackson's grievance history does not show any grievances were filed with respect to this claim. (Doc. 24, Ex. A).

Jackson filed the Complaint in this action on January 26, 2022. (Doc. 1). He then filed an Amended Complaint on February 14, 2022, (Doc. 7), and a Second Amended Complaint on April 22, 2022. (Doc. 12). Defendants Knapp, Brubaker, Solomon, and Anna filed a timely Motion to Dismiss on June 13, 2022, (Doc. 16),[10] which was converted to a Motion for Summary Judgment on August 9, 2022. (*See* Doc. 23). Defendants filed a Statement of Facts on August 18, 2022, (Doc. 24). A day later, Jackson filed a brief in opposition to the motion for summary judgment titled "Motion to Deny or Stay Summary Judgment Proceedings," (Doc. 25), to which Defendants replied to on September 2, 2022. (Doc. 26). On September 12, 2022, Jackson filed another brief in opposition to Defendants' motion for summary judgment (Doc. 27) along with a response to Defendants' statement of material facts. (Doc. 28).[11] Defendants replied to such brief on September 22, 2022. (Doc. 30). Jackson filed a sur reply to Defendant's September 22 reply on October 17, 2022. (Doc. 33). With all briefs submitted, the motion is ripe for review.

---

[10] A brief in support of that motion was filed as well. (Doc. 18).

[11] Although the document bears a postmark of September 7, 2022 and may be challengeable as untimely, Defendants elected not to challenge its timeliness. (*See* Doc. 30, p. 1, n.1).

## II.   **LEGAL STANDARD**

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that could alter the outcome" of the litigation, and "disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (quoting *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).

At the Rule 56 stage, the Court's function is not to "weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court must view the facts and evidence presented "in the light most favorable to the non-moving party" and must "draw all reasonable inferences in that party's favor." *Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014). A "scintilla of evidence" supporting the nonmovant's

position is insufficient; "there must be evidence on which the jury could reasonably find for the [nonmovant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Liberty Lobby*, 477 U.S. at 252) (alteration in original). Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by ... denying averments ... without producing any supporting evidence of the denials." *Thimons v. PNC Bank*, NA, 254 F. App'x 896, 899 (3d Cir. 2007) (citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported ..., an adverse party may not rest upon mere allegations or denial." *Fireman's Ins. Co. of Newark New Jersey v. DuFresne*, 676 F.2d 965, 968 (3d Cir. 1982); *see Sunshine Books, Ltd. v. Temple University*, 697 F.2d 90, 96 (3d Cir. 1982). "[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." *Lockhart v. Hoenstine*, 411 F.2d 455, 458 (3d Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985) (citing *Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir. 1981)).

## III.   DISCUSSION

Defendants contend that Jackson cannot meet his Rule 56 burden because he cannot adduce any competent evidence to support his bare allegations. The Court is constrained to agree.

Defendants have asserted that Jackson failed to exhaust the prison grievance process, cannot produce any admissible evidence that would establish the elements of his First, Eighth and Fourteenth Amendment claims other than his own self-serving, conclusory allegations, and has not identified any record evidence that would rebut this assertion. The Court agrees. Jackson has not, for example, pointed to a declaration or affidavit other than his own, medical records, witness statements, or any other evidence that could sustain a verdict in his favor. At summary judgment, "the non-moving party must oppose the motion and, in doing so, may not rest upon the mere allegations or denials of his pleadings but, instead, must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice." *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 288-89 (3d Cir. 2018) (alteration omitted) (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268-69 (3d Cir. 2014)).

The Court will nevertheless address each of Plaintiff's counts in turn.

**A. Dismissal of all Claims against Defendant Solomon except for Civil Conspiracy.**

Jackson brings four counts against Defendant Solomon, alleging violations of the First, Eighth and Fourteenth Amendments, as well as civil conspiracy under §1985. All claims pertain to the same alleged wrongdoing; specifically, that in retaliation for the grievances that Jackson filed, Defendant Solomon:

- Denied him clean bedding and uniforms;

- Isolated him from the BMU and placed him in a loud, cold cell;

- Denied him a step-down in the BMU program;

- Placed him on grievance restriction;

- Stole his shoes; and

- Stole his transcripts and lawsuit.

(Doc. 12, ¶¶53; 60; 66; 73-75). Jackson does not allege any personal involvement of Defendant Solomon regarding any of the above filed

grievances.[12] Rather, Jackson is presumably proceeding on a theory that his complaints to Defendant Solomon demonstrate her knowledge of and acquiescence to the misconduct he alleges against her subordinates, sufficient to establish her personal involvement therein. However, Jackson has failed to allege that Defendant Solomon had contemporaneous knowledge of the alleged wrongdoing and thus cannot proceed on an acquiescence theory.

A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence; however, allegations of knowledge and acquiescence must be made with appropriate particularity." *Id.* Additionally, a plaintiff must show that "some affirmative conduct by the supervisor played a role in the discrimination." *Andrews v. City of*

---

[12] Jackson averred that Defendant Solomon personally denied his appeal of the grievance restriction placed on him by Defendant Brubaker. (Doc. 12, ¶35). However, this claim is only brought against Defendant Solomon in Count IV (Civil Conspiracy) and will not be dismissed for the reasons set forth in this section. Nonetheless, it will be dismissed for the reasons set forth in Section III, Subsection F. *See infra*, pp. 44-45.

*Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990); *see also Rizzo v. Goode*, 423 U.S. 362, 377 (1976) (supervising officials do not violate the constitutional rights of the victims unless they have played an "affirmative part" in the misconduct).

To state a claim under a theory of knowledge and acquiescence, a plaintiff must allege both contemporaneous knowledge of the alleged wrongdoing and direct supervisory authority over the subordinate actor. *See Robinson v. Pittsburgh*, 120 F.3d 1286, 1293-94 (3d Cir. 1997) abrogated on other grounds by *Burlington Northern & Santa Fe Railway Company. v. White*, 548 U.S. 53 (2006); *Chinchello v. Fenton*, 805 F.2d 126, 133-34 (3d Cir. 1986). In other words, a supervisor has no affirmative duty under §1983 to take action against an offending subordinate after the fact. *Id.* To be liable under a theory of acquiescence, a supervisor must know that a subordinate is presently violating a prisoner's rights and fail to stop the violation. *Id.*

Here, Jackson avers that he first complained to Defendant Solomon on November 15, 2021. (Doc. 12, ¶35). Yet, the wrongdoing he alleges supposedly occurred many months before this conversation—as early as March 2020. (*Id.* at ¶¶19; 23; 25). The only misconduct of which Defendant Solomon is alleged to have had any contemporaneous knowledge is Jackson's assertion that his cell was cold and loud, an allegation that does

not rise to an Eighth Amendment violation and for which Defendant Solomon is entitled to qualified immunity. (*See* Section III, Subsection C, *infra* pp. 22-34). As Jackson only communicated with Defendant Solomon after the alleged wrongs had already occurred, he fails to meet the contemporaneous knowledge requirement of an acquiescence claim. *Robinson*, 120 F.3d at 1293-94. Jackson also fails to allege that Defendant Solomon played an "affirmative part" in any misconduct. *See Andrews*, 895 F.2d at 1478. As such, he has failed to state any claims upon which relief can be granted and all claims against Defendant Solomon, with the exception of Count IV, are dismissed.[13]

**B. Procedural Default of all Claims.**

Defendants argue that all of Jackson's claims are procedurally defaulted because Jackson failed to exhaust administrative remedies. In response, Jackson contends that Defendants have used "obstructive tactics" such as causing his grievances to "vanish[]" or placing him on a "retaliatory" and "pre-mature grievance restriction." (Doc. 33, pp. 1-2). The Court disagrees.

---

[13] Count IV is dismissed on other grounds. *See infra* pp. 44-45.

Under the Prisoner Litigation Reform Act (PLRA), a prisoner may not bring an action with respect to prison conditions "until such administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a). Exhaustion is mandatory, *see Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007); *see also Booth v. Churner*, 532 U.S. 731, 741 (2001) (holding that the exhaustion requirement of the PLRA applies to grievance procedures "regardless of the relief offered through administrative procedures"); *Nyhuis v. Reno*, 204 F.3d 65, 67 (3d Cir. 2000) (same), and "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Exhaustion must also be "proper," the prisoner must comply with all administrative requirements so that the agency can address the issues on the merits. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006); *Williams*, 482 F.3d at 639. Claims that have not been properly exhausted are procedurally defaulted. *Spruill v. Gillis*, 372 F.3d 218, 222 (3d Cir. 2004); *Couch v. Tritt*, 2016 WL 278776 at *5 (M.D. Pa. Jan. 22, 2016) ("Inmates who fail to fully, or timely, complete the prison grievance process, or who fail to identify the named defendants, are barred from subsequently litigating claims in federal court."). To determine whether a prisoner has "properly" exhausted a claim, the court must evaluate the prisoner's compliance with

the prison's administrative regulations governing inmate grievances. *Id.* "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007); *see also Woodford*, 548 U.S. at 90-91.

Here, the applicable procedural process governing inmate grievances and appeals is the DOC Administrative Directive 804 (DC-ADM 804). The process begins with the submission of a grievance form and a response thereto. If an inmate is dissatisfied with the initial response to his grievance, he may file an appeal to the facility manager in writing, within fifteen working days from the date of the initial review/rejection. An inmate dissatisfied with the decision of the facility manager may appeal to final review with the chief of SOIGA within fifteen working days from the date of the facility manager's decision.

Jackson was well aware of the grievance process when he used it forty-four times in the span of two years. (Doc. 24, Ex. A, pp.4-5; *see also* Doc. 12, ¶¶19, 23, 25). In his Second Amended Complaint, Jackson alleges that he filed grievances pertaining to at least eight different matters:

1. Broken computers and no recent cases in mini-law-library; (Doc. 12, ¶19).

2. Unclean bed linens and uniforms; (*Id.*).

- 20 -

3. Insect and pest infestation in cells; (*Id.*).

4. Officers stole his new shoes as retaliation; (*Id.*, ¶23).

5. Lack of staff training; (*Id.*, ¶25).

6. Lack of grievance forms in mini-law library; library unable to accommodate two inmates at the same time; (*Id.*).

7. Denied step-down from Phase 2; (*Id.).*

8. Officers stole his transcripts and lawsuit as retaliation. (*Id.* ¶36).

Except for certain alleged grievances (cold cell and lack of Covid-19 mitigation procedures), each of Jackson's claims have been raised through SCI-Rockview's grievance process, with only one appeal regarding his denial of a level step-down from his Level 2 status in the BMU Program. (Doc. 24, Exs. A and B). Yet, Jackson does not indicate the disposition of any of those grievances. He does not aver that he appealed any grievances that were rejected or deemed frivolous to the facility manager, nor does he aver that he appealed any grievances for final review by the chief of SOIGA. Rather, he asserts that he did not follow through on any appeals alleging that Defendant Brubaker "obstruct[ed] me from fully exhausting my grievances," (Doc. 12, ¶28), without specifying how or providing any evidence in support

of such allegation.[14] At best, Jackson argues that the grievance restriction blocked him from filing grievances. Unfortunately for Mr. Jackson, this argument rings hollow.

As was explained to Jackson, the grievance restriction merely <u>restricted</u> the amount of grievances Jackson may file at a time every fifteen working days during a ninety-day restriction period. *See Cummings v. Crumb*, 347 F. App'x 725, 727 (3d Cir. 2009) ("Thus, being on grievance restriction would not have prevented [inmate-plaintiff] from exhausting his remedies."). Jackson still retained available administrative remedies that he elected not to exhaust. Further, Jackson was placed on grievance restriction effective October 23, 2021. (Doc. 24, Ex. C). The vast majority of grievances at issue were filed well before October 2021 and thus Jackson's grievance restriction would have no effect on his ability to appeal. (*See id.*, Exs. A, B).

---

[14] The only evidence Jackson offers is his own affidavit that essentially re-packages his allegations in his complaint. (Doc. 28, ¶8). These documents contain no evidence of this alleged obstruction besides Jackson's own conclusory allegations, which are insufficient to overcome a Rule 56 motion. *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991) (The non-moving party must "set forth specific facts showing a genuine issue for trial and [he] may not rest upon mere allegations, general denials, or … vague statements…").

Others were filed as late as March 2022, after his grievance restriction had expired. (*Id.*).

This matter essentially boils down to an inmate-plaintiff seeking to shortcut the prison administrative process by adjudicating his grievances directly in federal court. This Court will not entertain him and all of Jackson's claims may be dismissed on the above grounds alone. However, given the fatal flaws existent in Jackson's claims above the procedural defect, this Court will nevertheless course through its analysis of demonstrating how Jackson's claims fail on other grounds as well.

### C. Counts I & V: Deprivation of Eighth Amendment Right and Deliberate Indifference to Conditions of Confinement.

Jackson argues that the denial of "clean bedding, placement in cold isolation cell, placement in back cell next to the RHU's constant banging, yelling & kicking all day, exposure to painful sores & rashes, exposure to painful coronavirus, exposure to deprivation of sleep & severe headaches, & the denial of a step-down program which prolonged plaintiff's stay in the BMU, was done maliciously and sadistically for the very purpose of causing plaintiff harm" "without legitimate law enforcement or penological purpose" to "deprive[] plaintiff of his Eighth Amendment right to be free from cruel and

unusual punishment in direct violation of Section 1983." (Doc. 12, ¶¶53-55, 80-82). The Court disagrees.

### i.    Conditions of Confinement

The Eighth Amendment prohibits any punishment which violates civilized standards of humanity and decency. *Griffin v. Vaughn*, 112 F.3d 703, 709 (3d Cir. 1997) (citing *Young v. Quinlan*, 960 F.2d 351, 361 (3d Cir. 1992)). To succeed on a claim that the conditions of confinement were violative of a plaintiff's Eighth Amendment rights, "a plaintiff must demonstrate both that (1) he has been denied 'the minimal civilized measure of life's necessities,' and (2) that prison officials acted with deliberate indifference to those conditions." *Whitney v. Wetzel*, 649 F. App'x 123, 127 (3d Cir. 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 833–34 (1994)).

The first prong is objective. *Griffin*, 112 F.3d at 709. While prison conditions are often less than ideal, only extreme deprivations of life's basic necessities are sufficient to violate the Eighth Amendment's prohibition on cruel and unusual punishment. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Dockery v. Beard*, 509 Fed. Appx. 107, 112 (3d Cir. 2013). Prison officials have a duty to provide humane conditions of confinement, but the constitution does not mandate comfortable prisons. *Carson v. Mulvihill*, 488

- 24 -

Fed. Appx. 554, 560 (3d Cir. 2012). The second prong is subjective. A prison official cannot be found liable under the Eighth Amendment unless he acts with deliberate indifference; that is: "unless the official knows of and disregards an excessive risk to inmate health or safety." *Brennan*, 511 U.S. at 837-38; *Hamilton v. Leavy*, 117 F.3d 742, 476 (3d Cir. 1997). Deliberate indifference requires obduracy and wantonness that constitutes recklessness or a conscious disregard of a serious risk. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (citing *Brennan*, 511 U.S. at 842). In the context of medical treatment, a prisoner must show prison officials "intentionally denying or delaying access to medical care or interfering with the treatment once prescribed." *Pearson v. Prison Health Service*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)).

Jackson argues that his confinement was inhumane because he was housed in a cold cell and suffered the sounds of "banging, yelling & kicking all day." Though uncomfortable, such a confinement does not rise to the level of an Eight Amendment violation. *See e.g., Burkholder v. Newton*, 116 Fed. Appx. 358, 363 (3d Cir. 2004) (it "is questionable if having a cold cell" is an atypical and significant hardship when "much more harsh conditions" do not violate the Eighth Amendment). As correctly noted by Defendants, both the

Supreme Court and the Third Circuit have held that low cell temperatures may satisfy the objective deprivation requirement of an Eighth Amendment claim, but only if the low cell temperature is exacerbated by other mutually enforcing conditions that deprive the inmate of adequate shelter. *See Wilson v. Seiter*, 501 U.S. 294, 298–99 (1991) (low cell temperature at night combined with failure to issue blankets may establish violation); *Sampson v. Berks Co. Prison*, 117 Fed.Appx. 383, 385-86 (3d Cir. 2006) (low cell temperature combined with refusal to provide additional clothing, move to warmer cell, or take any other measures to ameliorate the cold sufficient to survive motion to dismiss).

Here, Jackson acknowledges that after he wrote to prison officials about the low temperature in his cell, Defendant Knapp contacted maintenance to turn the heat up that same night, (Doc. 12, ¶43)[15] and the next day he was given extra blankets. (Doc. 12, ¶¶45-46). Thus, in contrast to the exacerbation of other mutually enforcing conditions discussed in *Wilson* and *Sampson*, Jackson was issued blankets, and measures were taken to ameliorate the allegedly cold temperature in his cell. Moreover, as

---

[15] Jackson alleges that Defendant Knapp said "I don't know how long it'll stay on" if he didn't withdraw his grievances, but Jackson never alleged that the heat was ever subsequently turned off. (Doc. 12, ¶44).

to Jackson's claim that he was deprived of sleep by inmates shouting and banging in nearby cells, it is well established that loud noises made by other inmates is insufficient to state an Eighth Amendment claim. *Whitney*, 649 Fed. Appx. at 123 (RHU inmates banging on toilets and sinks resulting in excessive noise that prevented plaintiff from sleeping does not meet objective criteria of conditions of confinement claim); *McClintic v. Pennsylvania Dep't. of Corrections*, 2013 WL 5988956, at *12 n.23 (E.D. Pa. Nov. 12, 2013) (loud noises and throwing of feces appear to be typical of conditions of confinement).

### ii.    Rashes, Sores and Skin Conditions

Rashes and other minor skin conditions have repeatedly been found not to represent "serious harm" sufficient to prevail an Eighth Amendment claim. *Fielder v. Fornelli*, 2011 WL 4527322, at *8 (W.D. Pa. Sept. 6, 2011) (rash caused by use of restraints "does not deprive the detainee of the minimal civilized measures of life's necessities" sufficient for an Eighth Amendment claim); *Tasby v. Cain*, 86 Fed. Appx. 745 (5th Cir. 2004) (rash caused by back restraints does not establish inmate suffered from serious harm); *McKeithan v. Beard*, 2010 WL 2028091, at *3-4 (W.D. Pa. April 12, 2010) (rash does not constitute "serious harm"); *Smith v. Schwartz*, 2011 WL 2115831, at *3 (S.D. Ill. May 26, 2011) (skin rash does not establish "serious

harm"). Here, Jackson acknowledges that once officials became aware of his skin conditions, he received medical treatment: the medical staff prescribed pain medication and hydrocortisone cream and Defendant Knapp gave him new bedding. (Doc. 12, ¶24). Because prison officials treated Jackson's skin conditions, they cannot be said to be deliberately indifferent to his skin rashes. *Fielder*, 2011 WL 4527322, at *8 ("[G]iven that Plaintiff's rash was being treated with hydrocortisone in an attempt to alleviate the rash, the Operative Complaint affirmatively rebuts the presence of a deliberately indifferent mindset.") (internal citations omitted). Thus, Jackson's claim fails under both prongs of the conditions of confinement analysis.

### iii.    Level Advancement or Step-Down

When Jackson first entered BMU, he was assigned to Level 5, but through hard work and good behavior, he was able to work his way down to Level 2. (Doc. 12, ¶17). Jackson alleges that Defendants refused to allow him to advance past Level 2, prolonging his stay in the BMU. (*Id.*, ¶¶16-18). However, there is no constitutional right for an inmate to be housed in particular place or under particular circumstances. *Podhorn v. Grondolsky*, 350 Fed. Appx. 618, 620 (3d Cir. 2009) ("it has been established that prisoners have no constitutional right to be assigned to a particular institution,

facility or rehabilitative program.") (citing *Olim v. Wakinekona*, 461 U.S. 238, 245 (1983)). Placement in a restricted housing unit does not violate the Eighth Amendment as it does not involve a deprivation of any basic human need. *Griffin*, 112 F.3d at 709. Further, Jackson has not averred to any substantial risk of serious harm, much less that prison officials were deliberately indifferent to that risk, based on this allegation.

### iv.   COVID-19 Mitigation Procedures

Jackson claims that he contracted Covid-19 because Defendant Knapp acted with deliberate indifference in failing to enforce proper mitigation procedures in the BMU. (Doc. 12, ¶¶80-81). It is well-established the Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments." *Brennan*, 511 U.S. at 837. In other Eighth Amendment claims in the context of the Covid-19 pandemic, the Middle District of Pennsylvania has recognized that prisons by their very nature are confined spaces unsuited for social distancing and held that the "inability to practice social distancing is not, in and of itself, sufficiently serious to implicate a violation of the Eighth Amendment." W*alker v. United States*, 2022 WL 1472872, at *6 (M.D. Pa. May 10, 2022) (quoting *Rodriguez-Francisco v. White*, 2020 WL 4260766, at *3 (M.D. Pa. July 24,

2020)). Numerous courts around the country have also concluded that similar allegations do not support a plausible inference that officials have demonstrated deliberate indifference to inmates' Eighth Amendment rights. *See, e.g., Swain v. Junior*, 958 F.3d 1081, 1089 (11th Cir. 2020) (plaintiffs did not demonstrate that defendants were deliberately indifferent to the risk posed by Covid-19 because the correctional facility had "implemented many measures to curb the spread of the virus"); *Wilkins v. Wolf*, 2021 WL 1578250, at *6-7 (M.D. Pa. Apr. 22, 2021) (finding that prisoner had failed to state an Eighth Amendment claim alleging inadequate response to Covid-19); *Shokr v. LeBlanc*, 2020 WL 8093228, at *4 (M.D. La. Dec. 14, 2020) (holding prisoner failed to state a plausible Eighth Amendment claim because prison took measures to combat Covid-19 virus); *Kesling v. Tewalt*, 476 F. Supp. 3d 1077, 1086-88 (D. Idaho 2020) (concluding that prisoner failed to set forth a plausible Eighth Amendment claim as prison officials had developed and instituted policies to curb the spread of Covid-19). Furthermore, Defendants have asked this Court to take notice of the measures the Department of Corrections have taken to mitigate the risk and

spread of Covid-19 in Pennsylvanian prisons.[16] These measures include providing personal protective equipment to inmates and staff, encouraging mask wearing, expanding video visitation, and screening individuals who enter a facility. *Id*. Courts in this district have previously held that these measures demonstrate that DOC officials have not acted unreasonably with the respect to the threat caused by the virus. *See e.g., Bevins v. Kauffman*, 2021 WL 322168, at *5 (M.D. Pa. Feb. 1, 2021).

Here, Jackson alleges that Defendant Knapp failed to enforce masking and social distancing, failed to allow additional sanitization, and failed to quarantine staff and inmates. (Doc. 12, ¶81). Notably, none of these allegations violate the posted DOC policy, which strongly recommends, but does not require masking. (*See supra*, n.16). The DOC's mitigation measures do not mention sanitization, social distancing, or quarantining. *Id.* As the Middle District has held the DOC's measures demonstrate officials have not acted unreasonably with respect to the threat of Covid-19—and Jackson does not allege Defendant violated the DOC's policies—Jackson has failed to state a claim upon which relief can be granted.

---

[16]    *See* https://www.cor.pa.gov/Pages/COVID-19.aspx (last visited June 22, 2022).

### v.    Defendants' Qualified Immunity on all Eighth Amendment Claims

The principles of qualified immunity shield a correctional officer from personal liability when she reasonably believes that her conduct complies with the law. *Pearson v. Callahan*, 555 U.S. 223, 244 (2009). To establish whether an officer is entitled to qualified immunity, a court must determine: (1) whether the facts alleged in the Complaint "make out a violation of a constitutional right" and (2) whether that right "was clearly established at the time of [the] defendant's alleged misconduct." *Montanez v. Thompson*, 603 F.3d 243, 250 (3d Cir. 2010) (quoting *Pearson*, 555 U.S. at 232). Whether an asserted right was clearly established at a particular time is a question of law. *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 637 (3d Cir. 2015) (citing *Elder v. Holloway*, 510 U.S. 510, 516 (1994)). To demonstrate that a right is clearly established, plaintiffs must proffer persuasive case law. *Id.* And while "a case directly on point" is not required to demonstrate a clearly established right, "existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor v. Barkes*, 575 U.S. 822, 824-25 (2015). In other words, "[i]n order for a right to be clearly established there must be applicable precedent from the Supreme Court," or "a robust

consensus of cases of persuasive authority in the Court of Appeals…"
*Spady*, 800 F.3d at 639.

The Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson*, 555 U.S. at 231-32. Because qualified immunity is an immunity from suit, not merely a defense to liability, the "driving force" behind the doctrine is to ensure "insubstantial claims" against government officials are resolved prior to discovery. *Id.* at 231. The Third Circuit has recognized that qualified immunity questions should often be determined in a pre-answer motion to dismiss, without the benefit of a factual record. *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 329-30 (3d Cir. 2014); *rev'd sub nom on other grounds, Taylor*, 575 U.S. 822 (2015); *see also Ball*, 726 F.3d at 461.

Here, for each of the conditions of confinement claims alleged by Jackson, Defendants have cited several cases holding substantially similar conditions do not rise to the level of an Eighth Amendment violation. (*See* Doc. 18, Sec. III, Subsecs. A-D). Thus, there is hardly a "robust consensus of cases" in this circuit on any issue set forth by Jackson and any constitutional question is far from "beyond debate." *See Spady*, 800 F.3d at 639. As such, Defendants are entitled to qualified immunity and all Eighth Amendment claims will be dismissed.

In sum, Jackson is unable to establish either extreme deprivation or deliberate indifference and his Eighth Amendment claims in Counts I and V will be dismissed with prejudice.

### D. Count II: Retaliation for Exercising First Amendment Right.

Jackson argues that most of the aforementioned acts taken against him (e.g., theft of his shoes and ninety-three-page lawsuit, placement in a cold and loud cell, exposure to rashes and Covid-19) was in retaliation for "plaintiff availing himself of his First Amendment right to file grievances and a lawsuit against correctional facility guards, officers, & officials at and/or responsible for another DOC facility." (Doc. 12, ¶60). Even assuming, *arguendo*, that Jackson properly exhausted his administrative remedies, it is clear that his First Amendment retaliation claim would nevertheless be subject to dismissal on its merits.

To state a prima facie case of retaliation in violation of the First Amendment, a plaintiff must establish the following elements: "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006); *see also Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001);

*Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000). To amount to retaliation, the conduct must be "sufficient to deter a person of ordinary firmness from exercising his First Amendment rights." *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) (quotation marks and citation omitted). "Although the elements of a First Amendment retaliation claim remain constant, the underlying concepts that they signify will vary with the setting— whether activity is 'protected' or an action is 'adverse' will depend on context...." *Thaddeus-X v. Blatter*, 175 F.3d 378, 388 (6th Cir. 1999). The fact of incarceration and the valid penological objectives of deterrence of crime, rehabilitation of prisoners, and institutional security justify limitations on the exercise of constitutional rights by inmates. *See Pell v. Procunier*, 417 U.S. 817, 822-23 (1974). Thus, a prison inmate "retains [only] those rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Id.* at 822.

Here, the factual allegations Jackson provides in support of his retaliation claim consist of the following:

- Theft of his transcripts and lawsuit allegedly because Defendant Anna gave them to Defendant Knapp who "said that [Jackson's] lawsuit was contraband, but he was supposed to give [Jackson his]

other legal materials back because [Defendant Anna] took those by accident." (Doc. 12, ¶36).

- Exposure to sores and rashes allegedly due to a lack of "new bedding" and "unsanitary living conditions." (Doc. 12, ¶24)

- Exposure to COVID-19 allegedly because prison officials "discontinue[ed] to enforce the procedures in place to protect inmates from contracting Covid-19". (Doc 12, ¶41).

- Theft of his shoes by prison officials allegedly because they "needed some new shoes to wear when they went hiking & if [Jackson] didn't file so many damn grievances against staff, then maybe they would've chosen some other inmates' sneakers to go hiking in." (Doc. 12, ¶21)

- Isolation from the BMU and placement in a loud and cold cell allegedly as retaliation for filing grievances. (Doc. 12, ¶¶37-38).

Jackson asserts that the alleged retaliatory acts and omissions were undertaken in response to his filing of inmate grievances and the lawsuit. The lawsuit argument fails immediately because all of the alleged "retaliatory" acts and omissions occurred before Jackson even filed his lawsuit. As for the filing of grievances, it is a protected activity under the First

Amendment, *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003), however, at the outset, it is also clear, from Jackson's pleadings and briefs, that he "consistently display[s] a preternatural, global, subjective sensitivity to alleged retaliation, … ascribing some retaliatory motive to virtually every action that occurs at the prison." *Smith v. Price*, 2012 WL 6541008, at *17 (M.D. Pa. Nov. 21, 2012), report and recommendation adopted, 2012 WL 6553651 (M.D. Pa. Dec. 14, 2012).

Jackson does not connect any of the alleged retaliatory misconduct to his grievance filing. The first three alleged acts were not even retaliatory in nature based Jackson's own words: (1) the reason he allegedly received rashes was due to no new bedding and unsanitary living conditions, (Doc. 12, ¶24), none of which were a result of any retaliatory acts; (2) the reason he contracted Covid-19 was a result of prison officials' "discontinuing to enforce the procedures in place to protect inmates from contracting Covid-19" that led not only to Jackson's Covid-19 contraction but also certain prison officials, including Defendant Knapp, (Doc. 12, ¶41);[17] and (3) Jackson's lawsuit was confiscated not in retaliation but because Defendant Anna

---

[17] Jackson alleges that Defendant Knapp "contracted [Covid-19] twice." (Doc. 12, ¶41).

thought it was contraband and only took the other legal materials "by accident." (Doc. 12, ¶36). As for the last two: (1) his shoes were allegedly stolen by prison officials who wanted to hike in them and would have refrained from doing so if "maybe" he didn't file as many grievances, (Doc. 12, ¶21), which translates to, at best, speculated retaliation for which this Court will not partake; and (2) regarding his isolation in a cell, Jackson does not explain when or how he was placed near the RHU, nor does he specifically allege that it was retaliatory; he merely states: "I have been placed back here in the last cell where it is extremely cold at & I'm being ostracized from the rest of the BMU inmates for no reason at all." (Doc. 12, ¶37).

None of Jackson's factual allegations provide any concrete, identifiable retaliatory misconduct. Rather, all we have are Jackson's attempts to "tie disparate events, committed by different actors, together into a seamless web of retaliation," in what he has deemed to be a campaign against him arising out of a resolve to stop him from filing frivolous grievances. *Brown v. Varner*, 2013 WL 4591817, at *15 (M.D. Pa. Aug. 28, 2013). Jackson invites this Court to believe that all of these events befell him as a result of prison officials' misconduct for which he has filed grievances for, and, at the same time, because he has filed grievances, he has suffered from those same

exact events. In essence, the misconduct led to his grievance filing, and the grievance filing led to the misconduct, creating a perfect circle of cause and effect. Unfortunately for Mr. Jackson, this Court is unwilling to accompany him around the logic loop he has constructed. Accordingly, this claim will be dismissed.

### E. Count III: Deprivation of Fourteenth Amendment Right.

Jackson brings a Fourteenth Amendment due process claim against all Defendants, alleging that they stole his legal documents, placed him on grievance restriction, denied him a step-down from Level 2 of the BMU program, and exposed him to rashes, sores, and the Covid-19 virus. (Doc. 12, ¶66.). The Defendants argue that such claims should be dismissed because Jackson was provided with a post-deprivation remedy for the alleged theft, has no liberty interest in where he is housed, and fails to allege a deprivation of any recognized constitutional right in his other claims. The Court agrees.

A plaintiff who brings a §1983 suit based on a violation of the due process clause must demonstrate: (1) that he was deprived of a protected liberty or property interest; (2) that this deprivation was without due process; (3) that the defendant subjected the plaintiff, or caused the plaintiff to be

subjected to, this deprivation without due process; (4) that the defendant was acting under color of state law; and (5) that the plaintiff suffered injury as a result of the deprivation without due process. *Sample v. Diecks*, 885 F.2d 1099, 1113 (3d Cir. 1989).

### i.   BMU and Step-Down Program

Jackson alleges that he was unfairly denied a step-down from Level 2 of the BMU program without any explanation or rationale. (Doc. 12, ¶66). He avers a lower level would have earned him privileges within the prison, including potentially being transferred out of the BMU and housed with the general population. (*Id.* at ¶¶16-18). Jackson alleges that he remained on Level 2 of the program for two-years while other inmates stayed on Phase 2 for as little as thirty-days. (*Id.* at 66). Unfortunately for Mr. Jackson, there is no constitutional right for an inmate to be housed in any particular custody or security classification. *Brown v. Parker*, 2010 WL 2080004, at *1 (M.D. Pa. May 21, 2010) (citing *Moody v. Daggett*, 429 U.S. 78, 88, (1976); *Montanye v. Haymes*, 427 U.S. 236, 242 (1976)). Inmates do not have a liberty interest in retaining or receiving any particular security or custody status "[a]s long as the [challenged] conditions or degree of confinement is within the sentence imposed ... and is not otherwise violative of the Constitution." *Id.* The transfer of an inmate to a less amenable and more

restrictive housing unit is well within the terms of confinement normally contemplated by a prison sentence and do not trigger a liberty interest. *Washington-El v. Beard*, 2013 WL 1314528, at *7 (W.D. Pa. 2013); *Wilkinson v. Austin*, 545 U.S. 209 (2005).

As such, Jackson has no constitutional right to be housed in a unit other than the BMU and no liberty interest is implicated in him being denied a step-down from Level 2 of the BMU program. To the extent Jackson purports to set forth an equal protection violation, his claim is likewise deficient. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). Jackson does not allege that he was denied a step-down based on his status as a member of a suspect class, nor does he allege that he was treated differently from similarly situated inmates in the BMU (*i.e.*, inmates with similar sentences, similar histories, and/or similar prison behavior): he simply alleges some inmates in the BMU stayed on Phase 2 for only thirty-days. (Doc. 12, ¶66); *see Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006). Thus, Jackson has failed to state a claim under the Fourteenth Amendment.

### ii.   Prison Grievance System

Jackson avers that on October 22, 2021, Defendant Brubaker placed him on grievance restriction for filing too many frivolous grievances. (Doc.

12, ¶28). That same day he appealed the grievance restriction to Defendant Solomon, who ultimately denied the appeal. (*Id.*, ¶¶29, 35). Jackson alleges the grievance restriction was arbitrary, retaliatory, and obstructed him from being able to challenge the conditions of his confinement. (*Id.* at 66). Yet, regardless of Jackson's allegations, access to prison grievance procedures is not a constitutionally mandated right. *Williams v. Armstrong*, 566 Fed.Appx. 106, 108-09 (3d Cir. 2014). The existence of a grievance process within a prison does not confer a liberty interest protected by the due process clause on prisoners. *Fears v. Beard*, 532 Fed. App'x. 78, 81 (3d Cir. 2013). Thus, any allegations of improprieties or misconduct in the handling of grievances do not state a cognizable claim under §1983, *Williams*, 566 Fed. App'x. at 108-09, and does not amount to a Fourteenth Amendment violation.

### iii. Post-Deprivation Remedy for Theft of Legal Documents

Jackson claims that Defendant Anna confiscated legal documents from his cell without providing notice or a means for him to challenge the deprivation of his property. (Doc. 12, ¶66). The law is well-settled that an unauthorized confiscation of an inmate's property does not violate his right to due process if a meaningful post-deprivation remedy is provided. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Monroe v. Beard*, 536 F.3d 198, 210 (3d Cir. 2008). Pre-deprivation notice is not constitutionally required. *See id.*

The Third Circuit has held that adequate post-deprivation remedies include the ability to file a state tort action or use of the prison's grievance process. *Tapp v. Proto*, 404 F. App'x 563, 567 (3d Cir. 2010); *Tillman v. Lebanon Cnty. Corr. Fac.*, 221 F.3d 410, 422 (3d Cir. 2000). The existence of either of these post-deprivation remedies therefore "forecloses any due process claim ... even if [the] inmate is dissatisfied with the result of the process." *Mearin v. Folino*, 2013 WL 5332120, at *7 (W.D. Pa. Sept. 23, 2013) (quoting *Iseley v. Horn*, 1996 WL 510090, at *6 (E.D. Pa. Sept. 3, 1996).

Here, Jackson indicates that after he noticed the legal documents missing from his property, he filed a grievance against Defendant Anna and Defendant Brubaker. (Doc. 12, ¶36). As Jackson had adequate access to a post-deprivation remedy in the form of the prison's usual grievance process, his due process claim is foreclosed.

### iv.    Rashes, Sores and Covid-19 Virus

Finally, Jackson alleges that "the exposure to painful sores and rashes…& exposure to the painful coronavirus…deprived the plaintiff of a healthy life." (Doc. 12, ¶66). Unfortunately for Mr. Jackson, this is not a cognizable Fourteenth Amendment due process claim and he fails to allege a deprivation of any recognized constitutional right. Neither Defendants nor this Court was able to find any case law supporting Jackson's contention that

- 43 -

one has a protected life, liberty, or property interest to be free of airborne pathogens or skin conditions.

Furthermore, Jackson fails to allege that Defendants deprived him of a liberty interest without due process—he simply alleges a prison guard (not any defendant) exposed him to coronavirus and that he developed rashes and sores. (Doc. 12, ¶66). Exposure to pathogens and skin conditions do not impose atypical and significant hardships on an inmate in relation to the ordinary incidents of prison life. *See Williams v. Secretary Pennsylvania Dep't of Corrections*, 848 F.3d 549, 558-59 (3d Cir. 2017). As such, Jackson Fourteenth Amendment claim will be dismissed in its entirety.

### F. Count IV: Civil Conspiracy Claim

Jackson brings a claim against all Defendants under 42 U.S.C §1985(3), alleging that they "conspired with each other & were in concert with each other to deprive plaintiff of his civil rights." (Doc. 12, ¶72). This count essentially re-packages the allegations Plaintiff sets forth in his other claims as a conspiracy orchestrated by Defendants against him. (*Id.*). Defendants argue that this count should be dismissed as Jackson does not allege that Defendants were motivated by a race or class based discriminatory animus. This Court agrees.

- 44 -

Section 1985(3) permits an action against individuals who conspire "for the purposes of depriving ... any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. §1985(3). Despite its application to private conspiracies, §1985(3) was not intended to provide a federal remedy for "all tortious, conspiratorial interferences with the rights of others," or to be a "general federal tort law." *Griffin v. Breckenridge*, 403 U.S. 88, 101-102 (1971). The *Griffin* Court emphasized that because §1985(3) requires the "intent to deprive of equal protection, or equal privileges and immunities," a claimant must allege "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action" in order to state a claim. *Id.* at 102. The Third Circuit has made clear that to state a §1985 claim, "a plaintiff must allege both that the conspiracy was motivated by discriminatory animus against an identifiable class and that the discrimination against the identifiable class was invidious." *Faber v. City of Paterson*, 440 F.3d 131, 135 (3d Cir. 2006) (citing *Aulson v. Blanchard*, 83 F.3d 1, 4–5 (1st Cir.1996)).

Here, the gravamen of Jackson's lawsuit is that Defendants retaliated against him because he filed numerous grievances challenging their conduct and the conditions of his confinement. (*See, e.g.*, Doc. 12, ¶¶1; 3-4; 28; 35-38; 60). Jackson has attributed a retaliatory motive to every act of

- 45 -

misconduct he alleges against Defendants. (*Id.*). As Defendants correctly argue, Jackson alleges that Defendants' animus is personal in nature and motivated by his repeated filing of grievances. Jackson does not, importantly, allege that Defendants were motivated by a "race or class based discriminatory animus" nor that their actions constituted "invidious discrimination against an identifiable class." *See Faber*, 44- F.3d at 135. Accordingly, Jackson fails to state a claim under §1985(3) and this count is dismissed.

## IV. <u>CONCLUSION</u>

Based on the foregoing, the Court will **GRANT** Defendants' motion for summary judgment (Doc. 16) and direct the Clerk of Court to **CLOSE** this case. An appropriate order follows**.**

*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Dated:  October 30, 2024**
22-0138-01

- 46 -